UNITED STATES ILLUMINATING COMPANY, Respond-
ENT, *v.* HUGH J. GRANT, as Mayor of the City of New
York, and Others, Appellants.

THE BRUSH ELECTRIC ILLUMINATING COMPANY,
Respondent, *v.* THE SAME.

THE MOUNT MORRIS ELECTRIC–LIGHT COMPANY,
Respondent, *v.* THE SAME.

*Electric-light wires not properly insulated are a public nuisance — the commissioner*
*of public works, or an individual, may remove them — refusal of the board of*
*electrical control to consent to repairs being made is no excuse to the electric-light*
*companies — power of the board of health is not exclusive — Chapter* 716 *of* 1887.

Various accidents having occurred through the use of the electric wires of certain
electrical illuminating companies in the city of New York, rendered dangerous
because of their want of proper insulation, the board of electrical control,
assuming to act pursuant to various acts of the legislature in relation to these
wires and to the authority conferred upon said board in relation to the construc-
tion of sub-ways, passed the following resolution:

"*Resolved*, That notice be given to all companies operating and furnishing
electric-lights on over-head wires in the city of New York, to discontinue the use
of such over-head wires as are not properly insulated, until such time as said wires
shall be certified by an expert of this board to be in proper and safe condition."

A few days thereafter, the companies, having been notified to shut off the electric
current from their wires, the mayor of the city issued a direction to the commis-
sioner of public works, directing him to remove all electric-light wires which
were improperly insulated; upon the receipt of which order, the commissioner
of public works proceeded to take down the wires claimed to be imperfectly
insulated, and, therefore, dangerous to human life. At this time sub-ways had
not been constructed sufficient for the purpose of operating the under-ground
wires of the illuminating companies, nor had the companies been permitted to
construct such sub-ways upon their own plans.

It was claimed by the illuminating companies that the board of electrical control
had refused to permit such repairs to be made upon the wires as would properly
insulate them, and that their rights of property were in jeopardy, and that the
public authorities were not justified in interfering with the conduct of their busi-
ness in the manner in which it was proposed to do.

*Held*, that this afforded no excuse to the illuminating companies for their failure to
keep the wires in proper condition.

That if the board of electrical control refused, arbitrarily, to allow repairs to be
made which were requested by the illuminating companies, and the rules and
regulations of that board were unreasonable, so that the companies were unable

to keep their wires in proper condition, the companies had ample remedies at law by which to compel that board to give them permits for the making of repairs if such permits were unjustly refused.

That the question whether the board would allow new wires, erected in place of the old ones, to be put up of larger size and greater conductivity than the wires which they replaced, was a matter within the discretion of that board.

That the commissioner of public works had the power to abate a public nuisance existing in the streets of the city, dangerous to the lives of its citizens, and was under no obligation to go first to the creator of the nuisance and inform him of the discovery of its existence and request him to abate it.

*Quære,* whether the legislature even could, without closing the street as a public highway and making provision for compensation to all parties damaged thereby, confer authority to conduct a business dangerous to human life upon a public street of the city.

That the commissioner of public works had no right to remove more wires than it was necessary to remove in order to abate the nuisance; and in determining this question he acted at his peril.

That the resolution of the board of electrical control, in so far as it provided that the discontinuance of the use of the wires should continue until an expert of the board should certify that such wires were in a proper and safe condition, was improper.

That the commissioner of public works had a right to act both as a private citizen and by virtue of his office in removing this obstruction, which became dangerous to human life, without notice to the illuminating companies.

That while the board of health might have the right to remove these wires because dangerous to human life, its power was not exclusive; that the department of public works also had the right, and it was its duty, to keep the streets of the city in a passable condition, and to remove all obstructions which interfered with their use.

Chapter 716 of 1887 is constitutional.

Appeal by the defendants, Hugh J. Grant, as mayor of the city of New York, and others, from orders made at a Special Term, and entered in the office of the clerk of the county of New York on the 11th and 12th days of November, 1889, whereby it was ordered that the temporary injunctions heretofore granted in the above-entitled actions be continued during the pendency of said action.

The order granting the injunctions restrained such of the defendants as constitute the board of electrical control in and for the city of New York from removing or causing to be removed certain electric poles and over-head wires or fixtures, and from preventing repairs of any of the poles or over-head wires, or the replacing of such poles or wires or fixtures as might be defective by proper poles or wires, and enjoining the defendant, the commissioner of public works,

from removing or causing to be removed, or interfering with any of the poles, over-head wires or fixtures.of the plaintiffs in the city of New York, except where suitable sub-ways have been provided and notice thereof given, without first giving the plaintiffs notice speci-fying in detail the particular wires and parts of wires defectively insulated, or for other cause needing repairs or replacement, etc.

*John M. Bowers* and *David J. Dean*, for the appellants.

*James C. Carter, Joseph H. Choate* and *Charles E. Hughes*, for the respondents.

Van Brunt, P. J.:

The circumstances relating to the organization of the United States Illuminating Company and the Brush Electric Illuminating Company are so similar that it is not necessary in the statement of facts to refer distinctly to those two plaintiffs. The Mount Morris Electric-Light Company stands in a different position in some respects, which will be hereafter noticed. The two plaintiffs first above mentioned seem to have been organized pursuant to the laws of this State for the purpose of generating and distributing through New York city electric currents for light and power. They were authorized to erect and maintain wires, poles and other fixtures incidental to their business over and upon the streets of the city upon obtaining the consent of the municipal authorities. This consent was given by resolution of the common council, and pursuant to this authority a large amount of money has been invested in the business for the prosecution of which these companies were organized, and poles have been erected and wires strung by virtue of their charters, and with the permission and under the protection of the municipal authorities. In 1884 the first act of the legislature (Chap. 354) was passed looking to a suppression of the evil which had been recognized, of allowing telephonic and electrical companies to occupy those parts of the streets which are above ground for their poles and wires. By this act it was provided that all telegraphic, telephonic and electric-light wires and cables used in any incorporated city of this State having a population of 500,000 or over should thereafter be placed under the surface of the streets and avenues of said cities, and that this should take place on or before the 1st day of Novem-

ber, 1885. And it was further provided that in case the owners of the property should fail to comply with the provisions of the act, the local governments of the said cities were directed to remove, without delay, all telegraphic, electric-light and other wires, cables and poles wherever found above ground within the corporate limits of said cities.

Compliance with this act having been recognized as an impossibility, in 1885 another act was passed, entitled "An act providing for placing electrical conductors under ground in cities of this State, and for commissioners of electrical sub-ways." (Laws of 1885, chap. 499.) By this act, within twenty days after the passage thereof, in cities having a population exceeding one million, according to the last census, the mayor, comptroller and commissioner of public works of such cities were authorized and directed to appoint three disinterested persons, residents of the respective cities for which they shall be appointed, to be a board of commissioners of electrical sub-ways. This board was charged with the responsibility of enforcing the provisions of the act hereinbefore mentioned, and the act of 1884 was amended so as to conform in all respects to the provisions of the act of 1885.

By the act of 1885 it was made the duty of the sub-way commissioners to cause to be removed from the surface and to be put, maintained and operated underground, wherever practicable, all electric wires or cables used in the business of any electrical company. Provision was also made for such companies constructing conduits under ground after approval of their plans by the board of sub-ways. It was further provided, that said sub-way board should carefully investigate any and all methods proposed by any such company. It further provided, that if no suitable plan was proposed or in use within sixty days after the passage of the act, it should be the duty of the board to cause to be devised and made ready for use, such a general plan as would meet the requirements of said acts, and that the board should have full authority to compel all companies operating electric wires to use the sub-ways so prepared. In the suburbs or along the streets, avenues or other highways in sparsely inhabited or unoccupied portions of any such city, the public interests not requiring the electrical conductors to be placed under ground, and

wherever in any other locality in any such city it was deemed by said board to be for any cause impracticable to construct and successfully operate under ground the electrical conductors required by any such company, it should be the duty of said board to examine and grant the application of any such company for permission to deviate from an under-ground system, but the board should not grant any such permission, unless satisfied upon such investigation that such a permission should, for one or the other reasons thereinbefore stated, be granted, and that it would not interfere with the successful working of under-ground conductors elsewhere in said city. It was provided, that such permit should be held and construed to authorize the construction and maintenance of the lines of conductors therein provided for, as and where prescribed by the board. It was also made the duty of the board in granting such permits, to bear in mind the purpose and policy of the act which was to convert the over-head systems in use in said cities to underground systems as soon as possible, without impairing the efficiency of their service.

The act further provided, that the work of constructing every line of conductors authorized by any such permit should be subject to the rules and regulations, not inconsistent therewith, prescribed or to be prescribed by the local authorites having control of the streets, avenues or other highways in such city, and that every such permit should specify the location of the structures to be erected and used for sustaining the electrical conductors and should give the general dimensions thereof. The act further provided, by section 5, that whenever said commissioners in carrying out the provisions of the act should permit any aerial electrical wires or cables to be erected, it should be the duty of the board to designate in such permit the route and location thereof, and to prescribe and regulate the height at which such wires or cables should be placed, and that all such wires and cables should be so erected and maintained as not to incommode the other public uses of such streets, avenues or highways. In 1886 an act was passed amending the act of 1885 in particulars which it is not necessary to mention here.

In 1887 another act was passed entitled " An act in relation to electrical conductors in the city of 'New York " (Laws of 1887, chap. 716), by which, after its passage, the board of commissioners of

electrical sub-ways, in and for the city of New York, heretofore appointed, together with the mayor of said city, for the time being, were constituted a board of electrical control, in and for the city of New York, and upon this board were conferred all the powers and duties imposed by the act of 1885, upon the commissioners appointed thereunder, and all the powers and duties theretofore by any law conferred or imposed upon the local authorities of said cities, or any of them, in respect to or affecting the placing, erecting, construction, suspension, maintenance, use, regulation or control of any electrical conductors, or conduits or sub-ways, for electrical conductors in said cities. And it was provided that such powers should thereafter be exclusively exercised or performed by said board of electrical control.

By the third section it was provided that, whenever in the opinion of the board in any street or locality of any city, a sufficient construction of conduits or sub-ways under ground should be made ready, under the provisons of the act, it should notify the owners of the electrical conductors above ground in such street or locality to make such electrical connections in said street or through other streets, localities or parts of the city with such under-ground conduits or sub-ways, and to remove poles, wires, etc., above ground, and their supporting fixtures or other devices, within ninety days after notice to such effect should be given. This provision was made a police regulation in and for the city of New York, and in case it was not complied with, it was made the duty of the commissioner of public works to cause the same to be removed forthwith by the bureau of incumbrances upon a written order of the mayor of said city to that effect.

The fourth section is as follows:

Section 4. It shall be unlawful after the passage of this act for any corporation or individual to take up the pavements of the streets of said city, or to excavate in any of said streets for the purpose of laying under ground any electrical conductors, unless a permit, in writing, therefor shall have been first obtained from the said board or its predecessors, and except with such permission no electrical conductors, poles or other figures or devices therefor, nor any wires shall hereafter be continued, constructed, erected or maintained or strung above ground in any part of said city. The said board of

electrical control may establish, and from time to time may alter, add to or amend all proper and necessary rules, regulations and provisions for the manner of use and management of the electrical conductors, and of the conduits or sub-ways therefor constructed or contemplated under the provisions of this act, or of any act herein mentioned.

Pursuant to the authority thus conferred, certain sub-ways in this city have been constructed; but sufficient sub-ways for the operating of the under-ground wires of the two plaintiffs' companies above-mentioned have not been constructed or provided for their use, and they have not been permitted to construct the same upon plans of their own. Under the authority conferred by the acts above mentioned, the plaintiff, the Mount Morris Electric-Light Company, has constructed its plant pursuant to the rules and regulations and under the supervision of the board of electrical control. Various accidents having occurred, the attention of the board and the city authorities was called to the condition of the electric wires which were being used by those companies, and it being found that many of these wires were dangerous, because of their want of proper insulation, the board of electrical control on the 9th of October, 1889, passed the following resolution:

"*Resolved*, That notice be given to all companies operating and furnishing electric-lights on over-head wires in the city of New York, to discontinue the use of such over-head wires as are not properly insulated until such time as said wires shall be certified by an expert of this board to be in proper and safe condition."

The companies plaintiff were a day or two thereafter notified to shut off the electric currents from their wires, and on the twelfth of October the mayor issued a direction to the commissioner of public works in the following language:

" SIR.— You are hereby directed to remove all the electric-light wires in the city of New York which are at this date improperly insulated, and which are now in position in violation of the rules and regulations of the board of electrical control. The wires to be removed under this order to be designated by the expert of the board."

Subsequent to the receipt of this order the commissioner of public works proceeded to take down wires claimed to be imper-

fectly insulated, and, therefore, dangerous to human life.  It is claimed, upon the part of the plaintiffs, that the said commissioner, in the carrying out of this work, not only removed wires where there was a break in the insulation, but also a number of blocks of wires all of which were of good quality, proper insulation and in perfect condition, and that he threatened on the following morning to take down the remaining connecting wires although in a state of perfect insulation.

The plaintiffs claiming that the condition of their wires was due solely to the arbitrary and unjust refusal of the board of electrical control to permit the plaintiffs to repair the same, without which permit such repairs could not be made, and that their rights of property were in jeopardy, and that the public authorities had no authority to interfere with the conduct of their business in the manner in which it was proposed to do, obtained and served the temporary injunction granted herein.  Upon argument this injunction was made permanent to the extent that the board of electrical control were restrained and enjoined " from removing or causing to be removed any of the poles or over-head wires or fixtures of the plaintiff in this city, except in such parts of said city where suitable under-ground sub-ways or conduits for the suitable reception of the over-head wires of plaintiff have been provided and made ready for the occupancy of plaintiff, and notice thereof given to said plaintiff as required by the statute in such case made and provided, and except where such under-ground sub-ways or conduits have been provided as aforesaid, from preventing repairs of any of the poles or over-head wires or fixtures of the plaintiff, or the replacing of such poles or wires or fixtures as may be defective by proper poles or wires or fixtures, and from ordering plaintiff to discontinue the use of its over-head wires, or any of them, except wires defectively insulated, and then only until such wires have been properly insulated or replaced by wires properly insulated."

And the defendant, the commissioner of public works, was enjoined and restrained from removing or causing to be removed any of these poles, wires or fixtures, except where suitable sub-ways had been provided and notice thereof given, without first giving the plaintiffs written notice, specifying in detail the particular wires or parts of wires defectively insulated, or for other cause needing

repairs or replacements, or the particular poles or fixtures needing repairs or replacement, and giving to plaintiff reasonable time to repair and replace the same, and only upon the default of the plaintiffs to make such repairs or replacement after such reasonable time had elapsed after the giving of such notice.

From such order this appeal is taken. It seems to us that but two questions are presented by this appeal, and they are:

*First.* Even if the board of electrical control, in those cases where sub-ways have not been provided, have refused permission to those plaintiffs to make such repairs as were necessary to keep their plant in a perfect and safe condition, will such refusal excuse the plaintiffs for their failure so to do? And, secondly, has the commissioner of public works the power to abate a public nuisance existing in the streets of the city of New York, dangerous to the lives of its citizens, without first going to the creator of the nuisance and informing him of the discovery of its existence by the authorities, and requesting him to abate the same, and thereafter waiting before proceeding to protect the lives of the citizens for some indefinite length of time, called a reasonable time, in order to see whether the creator of the nuisance will abate the same or not.

That the latter is a proposition presented by this appeal seems to have been conceded by the learned counsel for the plaintiffs upon the argument, and also by the learned judge in the court below. It was admitted upon the argument that, in the conduct of the business in which these plaintiffs are engaged, the wires employed for the conducting of the currents used by them for the purpose of lighting and the furnishing of power, unless perfectly insulated, are dangerous to human life, and without this admission, occurrences have taken place which demonstrate the proposition. The plaintiffs, therefore, are conducting a business by means of an apparatus and a force which, unless properly controlled, subjects every passer-by in the streets of New York to the danger of death. They are, therefore, bound in the prosecution of that business to use the highest degree of diligence, and if it is impossible for them to conduct their business without subjecting the passers-by upon the streets of the city to danger, although without negligence on their part, then it is doubtful whether the legislature even, could, without closing the streets as a public highway and making provision for

compensation to all parties damaged thereby, confer authority for the conduct of such a business upon the public streets of this city, because it would be giving up the streets to a purpose for which they had never been dedicated.

The proposition, then, which is presented is (in view of the rule of law requiring the plaintiffs, because of the dangerous character of the business which they are conducting, to use the highest degree of diligence), when the plaintiffs have failed to comply with this obligation, and when human life is threatened because of this failure, have not the public authorities, or for that matter any citizen, the right to at once remove such danger as a common nuisance? We think there can be but one answer to this proposition, and that, under such circumstances, the law allows this summary method of doing justice, because injuries of this kind require an immediate remedy and cannot wait for the slow progress of the ordinary forms of judicial procedure. In other words, human life is more sacred than the forms of legal procedure.

When it is apparent, as in the case at bar, that the condition of the wires of the plaintiff is such that they are dangerous to human life, and that any passer-by, without negligence on his part, is liable to be struck dead in the street, can it be said for a moment that the public authorities have no power to abate this nuisance and protect the lives of its citizens? Indeed, it is one of their highest duties, and if they allowed such a condition of affairs to continue, might make the city itself liable for the damages sustained by reason of their negligence in not removing the common nuisance. But it is said, upon the part of the plaintiffs, that their large investment of capital is thus left to the mercy of the public authorities, and that they are at least entitled to some notice of the defects complained of in order that they may remove the same. This proposition involves a claim, upon the part of these corporations, that the public authorities shall perform a duty which the law devolves upon themselves, namely, the proper inspection of their own apparatus, which is liable to become dangerous at any time, and the immediate remedying of the difficulty. It is not a part of the duty of the public authorities to inspect the apparatus of private corporations, and warn them when such apparatus becomes dangerous to human life.

There is one fact which seems to be established beyond question,

upon the papers before this court; and that is that, at the time of the commencement of these actions, the wires of these plaintiffs had become excessively dangerous by reason of defective insulation. Attention was called to this condition of affairs by the happening of accidents by which human life was sacrificed; and the great strife seems to have been between the electrical companies and the board of electrical control, as to upon whom the blame for this shameful condition of affairs was to be imposed. The companies claim that the board refused arbitrarily to allow repairs to be made which were requested by them, and that the rules and regulations of the board regulating these repairs were unreasonable, and that they were, in consequence, unable to keep their wires in that condition which their plain duty required should be done. But, even if this state of affairs existed, it was no excuse to the plaintiffs. They had ample remedies at their hand for the purpose of compelling the board of electrical control to give them permits for the making of repairs. If such permits were unjustly refused, the courts were open to them; and it is a familiar principle that where a permit upon the part of any of the city's officers is improperly refused, a *mandamus* may issue to compel the performance of that public duty. But these plaintiffs, when their wires got into such a condition, concededly, as made them public nuisances endangering human life, made not the slightest effort to compel the board of electrical control, if they unjustly refused, to grant them permits to repair; and it is a very significant circumstance when we take into consideration the dispute that arose between the board of electrical control and the plaintiffs.

If these electrical companies had been actuated by the slightest desire to put their apparatus in a condition such as would not endanger human life, they could easily have found a way to remove the obstruction which they claim was placed in their path by the board of electrical control. It would seem that they were only too willing to attempt to shelter themselves behind the assumed unreasonableness of some of the regulations of the board and to allow their apparatus to get into such a condition that it was dangerous to human life and become a public nuisance.

In the determination of the question as to whether the commissioner of public works should have been enjoined in the removal of

those wires which were not properly insulated, it is not necessary for us to consider or discuss this dispute.  The mere fact that the board of electrical control refused permits to which the plaintiffs were entitled, forms no excuse for their allowing these wires to get in this condition and remain so for the periods of time established by the papers before us.

There is no question but that, if the operation of their system had depended upon the procuring of these permits to which they were entitled, the plaintiffs would have found ready means to call the board of electrical control to reason.  But by sheltering themselves under this, as they now claim, unauthorized action of the board, they undoubtedly thought themselves excused from the expenditures of money necessary to render their apparatus safe for operation.  As has already been said, this formed no excuse for a longer time than would have been necessary to make an application to the courts to enforce their rights against the board of electrical control.

It should be observed that the complaint alleges that whatever disputes had arisen between the board of electrical control and the companies in respect to the making of repairs had been settled prior to the commencement of this action, and that the board had construed its rules so as to allow the plaintiff to take down old wires where this was deemed necessary and replace them by new wires protected by new insulation ; and it further appears by the other papers, that this occurred in August, 1889.  The complaint further alleges that it was still uncertain whether said board would allow the new wires, which were erected in place of the old ones taken down, to be of larger size and greater conductivity than the wires which they replace.  This, being new construction, was clearly a matter within the discretion of the board, and hence every question as to permits simply to repair, had been resolved long before the commencement of this action.  It further appears from the papers in this case that, at the time of the commencement of these suits, the wires of these companies were in a terrible condition in respect to imperfect insulation, and that they were a menace upon all sides to the safety of the passer-by upon the public streets.

The commissioner of public works, under these circumstances, in

view of his duty to remove obstructions from the streets, whether dangerous to the citizens or otherwise, had the duty devolved upon him to abate the nuisance at the earliest possible moment. It is true that in taking such action he, undoubtedly, did so at his peril, and in an action brought against him for the violation of the property rights of any one of these companies, he would be bound to show such a condition of affairs as rendered the existence of the wires so removed, a public nuisance. It is claimed, upon the part of the plaintiffs, that the commissioner of public works asserted the right to remove a whole line of wire because of a single defect. This, however, does not seem to be clearly established. He, undoubtedly, had no right to remove more than was necessary to abate the nuisance. But this right existed in the commissioner of public works in common with any other citizen who desired to use the streets of the city.

It is undoubtedly true, that no power other than that connected with his office was conferred upon the commissioner by the resolution of the board of electrical control or the direction upon the part of the mayor. The contingency had not arisen which authorized the board of electrical control, as a body, to put the commissioner of public works in motion ; nor was the mayor authorized to confer any authority upon the commissioner in respect to this matter which he did not enjoy by virtue of his office. Therefore, in the consideration of this question it has not been deemed necessary to discuss the action of the board of electrical control or of the mayor. It has also been assumed that these plaintiffs have a right to continue and maintain over-head wires until the sub-ways should be ready, provided such wires are maintained in such a manner as not to be dangerous to human life; and that they have a right, when such wires become out of repair, to repair the same, subject to the reasonable regulations of the board of electrical control, and that it is the duty of the said board, if necessary, to give the plaintiff permission to do so.

The learned judge in the court below seems to have conceded these propositions and said : " The plaintiff owes a duty to the public to keep its wires safe; and if the board would not take the necessary action to enable it to remove dangerous wires and put up safe ones, it should have applied to the courts for relief.

Under these circumstances, I think it was not only a proper and necessary regulation for the board to require the plaintiff to discontinue the use of such over-head wires as were not properly insulated, but that it was the plain duty of the board to make such regulation. Whoever may be responsible for the failure to supply sub-ways, and whether the plaintiff is wholly or only partially responsible for the fact that its unsafe wires were not repaired, when it became apparent that human life was endangered by reason of the imperfect insulation of some of its wires, it was the right and duty of the board to direct the immediate discontinuance of the use of such wires. Nor do I think it was necessary to the validity of such action that the plaintiff should have had notice and an opportunity to be heard and to remedy the defects before the resolution was adopted. A wire carrying a heavy current of electricity, and not properly insulated, is dangerous to life, and is a public nuisance, and I think the board had the right to direct the immediate discontinuance of such wires without notice to the plaintiff. I am inclined to think, however, that the resolution which was adopted went too far in providing that such discontinuance should continue until the expert of the board should certify that such wires were in a proper and safe condition. The plaintiff has no control over such expert, and it is possible that, for reasons satisfactory to himself, he might never give such a certificate, even if the wires were made perfectly safe."

It would thus appear that his judgment was founded upon the assumption that the commissioner of public works derived his authority to act from the board of electrical control and the mayor; and that the action of the commissioner should not be controlled by the opinion of the expert of the board of electrical control; and that the board had no power to compel the discontinuance of the wires until the expert should certify that such wires were in a safe and proper condition; and that the decision of the expert, as to the want of safety of the wires, would not necessarily justify the action of the commissioner.

In these latter propositions, we think the learned judge was clearly right. But the commissioner of public works had a right to act both as a private citizen and by virtue of his office, and to remove these obstructions which had become dangerous without notice to the

plaintiffs, and, therefore, the injunction which was granted was entirely too broad in restraining all action upon the part of the commissioner of public works until the companies should have an opportunity to remedy the defects pointed out by him. Considerable has been said upon the argument, and is also contained in the brief of the counsel of one of the parties plaintiff, that the power to remove nuisances which had become dangerous to life is vested in another department of the city government.

It may be true that the board of health, under the peculiar phraseology of the act conferring powers upon them, would have a right to remove these wires because dangerous to human life. But their power was not exclusive. The department of public works had a right also, and it was its duty to keep the streets of the city of New York in a passable condition, and to remove all obstructions which interfered with their use, and, therefore, had ample authority to abate this nuisance. If this was not so, will a court of equity intervene by injunction to restrain the abatement of a nuisance by the public authorities simply because the proper department is not acting? We think not. The nuisance existing, the court will not limit its abatement to any particular officer of the municipality unless the exclusive power is plainly conferred upon one department. Even then, the right of an officer of the municipality to act as a private citizen in a perfectly clear case would not be affected.

The counsel for the respondents, while apparently conceding the right of the commissioner of public works to remove an imperfectly insulated wire, urges that the right of removal must, in the first place, depend upon a determination by the commissioner of the condition of the fixture, and this he has no right arbitrarily to determine without notice and without affording the plaintiffs an opportunity to be heard; and if the pole or wire is defective or unsafe, it should not be removed or the nuisance abated without granting to the plaintiff an opportunity to remedy the alleged defect. That the commissioner should not act arbitrarily, and without a determination as to the condition and existence of the nuisance, is undoubtedly correct. But where a party erects and maintains knowingly a public nuisance in the streets of New York necessarily dangerous to human life, we know of no rule of law which requires the public authorities or the public to abandon the streets until the party maintaining the nuisance shall have an

opportunity to be heard as to its existence, and, after such hearing, an opportunity to remove the same.

In this proposition the learned counsel seems to us to overlook the important fact that it is because of the gross negligence of the plaintiff that these wires were allowed to become a public nuisance, as they are conceded to have been at the time of the commencement of this action.

The plaintiffs have been guilty of a willful violation of a manifest duty in allowing these wires to become dangerous. They are without excuse, and when they claim that the destruction of these instruments of death, maintained by them in violation of every duty and obligation which they owe to the public, is an invasion of their rights of property, such claim seems to proceed upon the assumption that nothing has a right to exist except themselves. It is idle to say that a party knowingly maintaining a nuisance, which may at any time deal death to innocent passers-by, can for an instant be entitled to the protection of the law in its maintenance. If these plaintiffs had been without fault, a different question might have been presented. But it is evident that they were guilty of the highest degree of negligence. The commissioner had authority, both as a private citizen and as a public official charged by the duties of his office with the removal of obstructions from the streets of the city, to abate the nuisance complained of.

Some of the affidavits contained in the record appear to claim that the commissioner of public works, although not acting wantonly in his attempts to abate the existing nuisance, yet either had removed or threatened to remove, before the hearing of the motion in the court below, certain wires which were not in a defective condition; we have not deemed it necessary to advert to those claims because the complaint, as filed, contains no averments under which proof of such facts would be admissible; and as the relief granted must depend upon the allegations of the complaint, no such question is presented for consideration.

It follows, therefore, that the order appealed from should be reversed, with ten dollars costs and disbursements.

BARRETT, J.:

While concurring in the conclusion arrived at by the presiding justice, and also in what he has so forcibly said, there are one or

two additional considerations which it may, perhaps, not be unprofitable to place upon record.   We start with the constitutionality of the act of 1885, deliberately settled by the Court of Appeals. (*Squire's Case*, 107 N. Y., 593.)   A careful comparison of that act with the act of 1887 shows no such divergence in the latter enactment as to render its constitutionality doubtful.   This has been affirmed in several cases (*U. S. Illuminating Co.* v. *Hess*, 19 N. Y. State Rep., 883 ; and see *W. U. T. Co.* v. *Mayor*, 38 Fed. Rep., 552, and *East River Electric-Light Co.* v. *Grant*, MSS. opinion, INGRAHAM, J.) ; and it cannot be doubted that if the act of 1887 had been before the Court of Appeals, it would have received the same treatment as the act of 1885 ; for the principles enunciated by RUGER, Ch. J., in the *Squire Case* (*supra*), are directly applicable to the provisions of the later enactment.   It is true that a literal and strained construction of section 4 of the act of 1887, might subject some of its provisions to constitutional objection.   The plaintiffs have, undoubtedly, acquired property rights and franchises, of which they cannot be deprived without just compensation. . They are duly incorporated under legislative sanction.   They have obtained the consent of the local authorities to their corporate use of the streets, and they have obtained this pursuant to legislative direction.   Upon the faith of this authorization from the law-making power, they have expended large sums of money, and otherwise acted upon the legislative license.   From this condition of things two propositions flow. First. The license having been acted upon, and something done by the licensee in consideration thereof, it has become invested with the qualities of a contract.   Second. Such of the companies' operations as may reasonably be said to have been contemplated by the legislature, cannot be deemed a nuisance.   So far as the public is concerned, the legislative power, within its constitutional limits, is substantially omnipotent.   A proper construction of this fourth section, therefore, calls for the clear recognition of the cardinal considerations.   First. That there can be no implication of a legislative intention to deprive the plaintiffs of their vested rights.   Second. And, on the other hand, that there can be no implication of any such intention to authorize an inherent nuisance ; not merely something which, but for the legislative sanction, would constitute. an illegal structure in the highway, but something essentially *malum*

*in se.* Thus viewed, there is little difficulty in giving this section a reasonable and harmonious interpretation, just to the companies and not inimical to the public welfare. The companies are not organized under these later acts, which, indeed, have no relation to such corporate organization, but under an act passed at a time when the present methods of applying the electric principle were not in vogue, and were probably not even dreamed of. (Laws 1848, chap. 265.) *The acknowledged nuisance of non-insulated wires,* seemingly unavoidable at times, in these modern systems, was not then contemplated, much less authorized; nor was any particular method of applying the electric principle referred to in either of the amendatory acts. (Laws 1879, chap. 512; Laws 1882, chap. 73.) We have been referred to no statute expressly authorizing the present methods of electric application for street illuminating purposes. On the contrary, the acts passed in and since 1884 indicate a legislative awakening to the fact that advantage was being taken of harmless general laws to incorporate for dangerous uses; and every one of these acts (1884, 1885, 1886 and 1887) speaks loudly of a growing disposition on the part of the legislature to check the evil of such dangerous uses. The purpose of the act of 1887, was largely to reaffirm the previous determination that all these dangerous appliances should be placed under ground, and finally to complete its execution. Until the sub-ways were ready for their occupation, the companies were permitted to proceed with the business for which they were organized by means of the existing over-ground fixtures and apparatus. To maintain, until the completion of the sub-ways, such existing fixtures, apparatus and wires as were really safe, and as were covered by due previous authorization, these companies were not bound to procure a fresh permit from the new board of electrical control. But they could not supplement such fixtures, apparatus or wires, nor otherwise add to their existing systems without such permit.

Nor could they continue even their existing systems at any point where, owing to non-insulation or defective apparatus, their wires had or might become dangerous to the community, at least until the apparatus had been rendered perfectly safe for the conduct of this intense electric agent. To that extent, and for the purpose in general of securing the public safety, pending the construction of the sub-ways,

the legislature conferred upon this board, the power of granting or refusing permits. This power must, of course, be exercised reasonably ; but, subject to this rule of reason, and especially in view of the general purpose referred to, it is necessarily continuous, and it involves the authority from time to time to revoke such permits when public safety imperatively demands some modification of the deadly force or more perfect insulation or other safeguards. It is. clear to my mind that, in these particulars, there is in this act of 1887 a valid exercise of the police power and a valid delegation of such power to the board, and such is the true construction of the meaning and intent of the fourth section of that act. If, then, the plaintiffs' entire systems are necessarily and unavoidably dangerous to human life, as matter of fact, they can be restrained or abated by appropriate proceedings, for, so far as their mode of using electricity is thus dangerous to human life, it is without legislative authority, express or implied, and the systems, under such use, become nuisances. But the entire structure cannot be summarily destroyed if the particular nuisance can be otherwise restrained or abated. Where the offense consists in the wrongful use of what is harmless in itself, the remedy is to stop such use, not to tear down or remove the structure. (*Moody* v. *Board of Supervisors,* 46 Barb., 665, 666, citing *Barclay* v. *Commonwealth,* 25 Penn. St., 503.) If the entire system becomes, as a conclusive and openly apparent fact, so flagrantly and imminently dangerous to human life as to come within the principles governing conflagrations and pestilence, the corporate authorities can, doubtless, summarily abate it. If, however, the systems are not necessarily and unavoidably dangerous to human life, if they can be kept in a safe condition by active vigilance and proper repairs, they are permitted to continue until the sub-ways are ready for their reception. In that case, however, while the entire system may not be a nuisance, each part of it which is suffered to become dangerous is *a nuisance,* and, as one of the learned counsel for the plaintiffs justly and candidly conceded, upon the argument, "a nuisance of the highest kind."

At this point we come to the practical question raised upon the motion below. Here let me say that my difference is not with Mr. Justice ANDREWS' opinion in the main, but with his order. That opinion is a careful, exhaustive and generally accurate statement of

the facts and the law.  Indeed, I cannot see that we reach this point by different roads.  The learned judge concludes that non-insulated wires are nuisances and that they should be promptly abated.  But he thinks that before abatement by the public authorities the companies should have notice and a reasonable opportunity to repair; and that an injunction, upon the facts before him, should issue to restrain a summary abatement of the nuisance or nuisances until the person attempting such abatement, has given the companies this notice and such reasonable opportunity to repair.

It is here that our roads diverge.  I cannot think that such an injunction was authorized by the case presented by the complaints. Moreover, the equities of the bills were fully denied.  Nor is there sufficient proof in the affidavits to justify the apprehension that these public officers are acting in a wanton or oppressive spirit, nor to warrant the belief that the abatement of non-insulated wires is to be used as a pretext for the unnecessary destruction of any part of the plaintiff's system which is not really dangerous to the community. The case is, consequently, within the principles laid down in *Hart* v. *The Mayor* (9 Wend., 571); *Meeker* v. *Van Rensselaer* (15 id., 397); *Cronin* v. *The People* (82 N. Y., 320), and similar cases.  It is freely conceded that this power of abating nuisances must be reasonably exercised; and, as is said by Judge Dillon, in his work on Municipal Corporations (vol. 1, § 95): "Although the power be given to be exercised in any manner the corporate authorities may deem expedient, it is not an unlimited power, and such means only are intended as are reasonably necessary for the public good; wanton or unnecessary injury to private property and private rights are not thereby authorized."  (Citing *Babcock* v. *City of Buffalo*, 56 N. Y., 268.)  There is another principle which should be conceded with equal freedom, and that is that the corporate authorities cannot, by their mere declaration, make that a nuisance which, in fact, is not.

Where, however, the thing sought to be abated is "intrinsically and inevitably a nuisance" there, as is said by Judge Dillon (vol. 1, § 379), "the authority to preserve the health and safety of the inhabitants and their property" is a sufficient foundation for ordinances suppressing and prohibiting it.  "Much," he adds, "must necessarily be left to the discretion of the municipal authorities, *and*

*their acts will not be judicially interfered with unless they are manifestly unreasonable and oppressive* or unwarrantably invade private rights or clearly transcend the powers granted to them."

The cases cited abundantly establish the proposition that Mr. Gilroy had a right summarily *to abate the common nuisance of any non-insulated wire found to exist in the plaintiffs' systems.* He had this right both individually and officially, and he was not dependent for his justification upon either the resolution of the board or the order of the mayor. In *Meeker* v. *Van Rensselaer* (*supra*) the defendant was an alderman. He was sued for pulling down five dwelling-houses which were proved to be nuisances. He also proved that the board of health had directed the nuisances to be abated. The Supreme Court held that his justification on the latter head failed because the minutes of the board had not been produced. But the court said that, in its judgment, the proof was immaterial, "because the defendant did not need any authority from the board of health. *As a citizen* of the fifth ward who desired to preserve the public health, and *especially as an alderman*, he was fully justified in every act done by him." According to the ruling now under review, a court of equity might have enjoined that citizen and alderman until he had given the owners of the five houses notice and a reasonable opportunity to abate; and, indeed, such an injunction would have been more reasonable in a case where the mere touch of the houses did not necessarily involve immediate death. So, in *Hart* v. *The Mayor* (*supra*), it was held that the municipality, *as a corporate body*, had the right to abate a nuisance detrimental to the trade of the city; and the Court of Errors affirmed an order of the chancellor dissolving an injunction which restrained the corporation from summarily abating such nuisance. Mr. Justice SUTHERLAND said that the right did not depend upon the validity of the ordinance, *considered as a legislative act*, any more than it does here upon the resolution of the board or the order of the mayor, but that the real question was, "whether the corporation had power *upon any principle* whatever to do the act which the ordinance authorized to be done. The injunction restrained the corporation *and their officers* from intermeddling with or removing the complainants' float. If that float is a public nuisance which the corporation had a right to abate, that right cannot be affected or impaired by their having

undertaken, in the form of an ordinance, *to prescribe to their agents or officers the manner in which they should proceed to cause it to be removed.* I have already expressed the opinion that this float, considered as an unauthorized obstruction either of the river or the basin, was a public nuisance ; and the books lay down the rule in very broad terms, *that any person* may abate a common nuisance." In the same case, Senator Edmonds said that he entertained no doubt that the " respondents, *as a corporate body*, had a right to abate the nuisance." Any person, he said, " may abate a common nuisance." The objection was there made, that the plaintiffs, by their corporate action, would be deprived of their property without due process of law or trial by jury. To this Mr. Justice Sutherland answered, that the provision of the Constitution was inapplicable, because there was a right summarily to remove the obstruction. " Formal legal proceedings," he observed, " and trial by jury are not appropriate to and have never been used in such cases." (To the same effect, Senator Edmonds, see his remarks at pages 609 and 610.) If these doctrines were maintained in a case where commercial interests alone were in question, and where the obstruction was claimed to be but partial and limited, surely, *a fortiori*, they apply where human life and the free enjoyment of the highway (without fear or apprehension) are involved.

To require a preliminary notice, under such circumstances, would be to paralyze the legal agencies provided to secure the safety of the inhabitants of the city, and to set a premium upon corporate negligence. That, too, in a case where the highest corporate diligence is demanded. Nothing whatever should be permitted to stand between the officer of the municipality and the actually non-insulated wire ; nor should he be hindered or delayed for one moment in his laudable purpose of protecting his fellow citizens by its neutralization. If, in destroying its deadly force, the officer exceeds his duty, the remedy at law is ample. So, also, is the remedy in equity, if he shall attempt unnecessarily to destroy the entire system, or so large a part of it as, substantially, to bring about that result or otherwise to work irreparable injury in the sense which we have pointed out. But so long as he acts fairly and moderately, without wantonness or oppression, he has nothing to fear. At all events, the last thing that should be set in motion, to

paralyze his honest efforts for the protection of human life, is the power of a court of equity, exercised on mere motion *pendente lite.*

In my judgment, this part of the order should be reversed and the injunction as to Gilroy wholly dissolved. That part of the order which enjoins the board of electrical control from preventing repairs was clearly unauthorized. It is in the nature of a final mandatory judgment and is, in effect, a peremptory *mandamus* granted before trial in an equity suit. The facts upon which it was granted showed that the only substantial dispute was as to the right to replace old wires by new ones, larger in size and of greater conductivity. The general right to repair had been conceded long before the commencement of these suits.

Upon these facts, the utmost that the plaintiffs would have been entitled to, even in a proper proceeding, was an alternative *mandamus ;* and, in view of the discretion vested in the board with regard to fresh constructions, and the probability that such discretion covered larger wires of greater conductivity, even an absolute denial of an application for a *mandamus* would have been justified. Both upon the facts, then, and the law regulating such procedure, this part of the injunction should fall with that which has been the main subject of consideration.

VAN BRUNT, P. J. :

I concur in the additional suggestions contained in this opinion.

BRADY, J. :

I concur with my brethren that the order appealed from should be reversed.

I regret that my duties in the Oyer and Terminer have been so prolonged that I am unable to state fully my views of the questions presented for consideration on this appeal, and I must content myself with a very brief opinion in order not to delay the decision herein. Whatever rights the plaintiffs have acquired by legislative grant are subject to the dominant law of public safety, and it must be assumed that such rights were secured and invoked with knowledge of this controlling principle. The legislature has no power to violate it, and consequently none to authorize an enterprise to be conducted in the public streets by the use of a death-dealing factor, unless the conditions imposed, surrounding and controlling, it are

such as to secure the public safety, not for a time, but for all time during its use. And whenever this safety ceases to exist, the business immediately becomes a nuisance more or less, and may be abated as such by any citizen who chooses to exercise the power, he assuming only the responsibility of proving it to be as asserted.

Indeed, the object of the sub-way for which the legislature called and provided by various acts, is undoubtedly, in part at least, based upon the dangerous character of the plaintiffs' business and the legislative duty of securing the public safety. The creation of a business extra hazardous in the public streets, or of organizations to use elements therein dangerous to life from their very nature, can only be legal, if at all, when they are so burdened as to secure the public safety preliminarily to such use and its continuance by the untiring, and, indeed, unfailing vigilance of the person or corporation. If this cannot be done, then a nuisance is created and exists, and not a lawful enterprise. There should, in other words, be no intervals of this safety when life may be sacrificed by the condition of some instrument or agency used in the business. This may seem to be a severe, even harsh rule, but the duty to secure the public safety, the lives of citizens, renders its enforcement imperative.

Order reversed, with ten dollars costs and disbursements.