Kline, Carr, Tolles & Goff, for defendant.

---

(Hamilton County Common Pleas, 1901.)

## THE MILLCREEK VALLEY STREET RAILROAD COMPANY v. VILLAGE OF ST. BERNARD et al.

---

It is the duty of an electric street railroad company to maintain its tracks in a safe condition, and it has at all times the right to do it. And if local authorities refuse the company permission to make repairs, the law compels it to exhaust every legal remedy to prevent the interference of local authorities.

A municipality has the right by virtue of the control over its streets, granted by statute, to establish regulations for the conduct of a street railroad which promote the public safety and welfare, but which must not unreasonably interfere with the franchise, management or business of the street railroad company, or violate the obligations of any valid contract.

Conditions under which a municipal council, by resolution, granted a street railroad company permission to repair its tracks, poles and wires, considered, and such as have reference to public safety, comfort and welfare, sustained, while those which do not appear to have reference to the public good, or are in conflict with the franchise under which the street railroad company is operating, are held not a proper exercise of the police power and invalid.

SPIEGEL, J.

On the 9th day of November, 1900, the Millcreek Valley Street Railroad Company filed its petition in this court against the village of St. Bernard, its councilmen, mayor and marshals, praying for an order to restrain the defendants and each of them from interfering with or in any manner molesting plaintiff or any of its officers or agents in the quiet and peaceable enjoyment of its said railway property; from obstructing plaintiff, its officers or agents in restoring its tracks and other railway appliances aforesaid, and in maintaining its said tracks and other railway appliances in proper condition and repair, and from interfering with the plaintiff's use and operating of the same in the regular carriage of passengers through said village, along said tracks or any part thereof whatsoever.

Plaintiff alleges that it is the owner of and is engaged in operating a certain line of electric street railway in the county of Hamilton, beginning in the c'ty of Cincinnati, at the entrance to the Zoological Gardens in Erkenbrecher Avenue, and extending thence along said avenue to the Carthage Pike by double tracks; thence along said Carthage Pike northwardly by double track to Lockland Avenue in the village of Carthage; thence continuing along said avenue by double track in said village to the north corporation line thereof; and thence continuing along the present line of said railway by double track through the village of Hartwell and into the village of Lockland.

Plaintiff then alleges its title derived from different sources, reciting the litigation which ensued, and in which its title was confirmed by judicial decree, thus eliminating this question from the case at bar, alleging in said recital that the original grant made by the Commissioners of Hamilton County for the occupancy of the Carthage Pike, and especially that portion of the pike which runs through St. Bernard, was made at the special instance and request of the officers and citizens of said village, by resolution passed, February 4, 1889, and that said resolution was afterward, on the 5th day of February, 1889, re-enforced by an ordinance duly passed by the council of said village, and known as ordinance number 275, of the ordinances of the village of St. Bernard, which ordinance granted to the Cincinnati Incline Plane Railway Company, the predecessor of the plaintiff, the right to use and occupy the streets of said village at grade with railway tracks, poles, wires, side tracks, and other appurtenances required for the construction and running of an electric road.

Plaintiff further avers, that the said electric railway line was constructed and put into operation at great cost and expense to its owner in and through said village along the line before mentioned shortly after the action taken as aforesaid by the council of said village, by its resolution and ordinance aforesaid, and upon the faith thereof, as well as upon the faith of the grant so made as before stated by the Board of Commissioners of Hamilton County.

Plaintiff further avers, that its said railway is equipped with cars and electric appliances and motive power, and is in daily operation for the carriage of passengers between the two termini before mentioned, and that said electric railway accomodates a large number of passengers daily, and that any interference with the maintenance of any portion thereof, and especially the portion within the village of St. Bernard, would substantially, if not wholly, destroy the usefulness and value of said railway.

Plaintiff further avers, that the overhead equipment of said electric railway is now and has always been of the pattern known as the singe-trolley ground return system; that the pole supports for same are now, and have always been, wooden poles of from 26 to 30 feet in length, set in the ground to a depth of 5 or 6 feet and 18 inches inside the curb line of the street; that said electric railway has been maintained and kept in operation through said village of St. Bernard ever since its first construction, and at great cost and expense of its owner, upon the faith of all of said acts with the acquiescence of said village, and its council and officers; and that all the owners of property abutting along the line of said railway, either actually consented to the construction and operation of said railway at, or prior to the time the same was built, and have ever since acquiesced therein.

Plaintiff further avers, that much of the existing construction and equipment of said electric railway has been in constant, daily and continuous use for more than ten years last past, and that by reason of the wear and tear incident to such use, the road-bed, tracks, trolleywires and other necessary appurtenances to said electric railway within said village have fallen in many places, into disrepair and require immediate restoration and repair, and that if said road-bed, tracks, poles, trolleywires and other necessary appurtenances are permitted to remain in their present condition, the use and operation thereof will become dangerous to passengers on plaintiff's cars through said village, and will result in irreparable injury and damage to plaintiff in respect to its said railway property.

Plaintiff further avers, that it has applied respectively to the village council of St. Bernard and to the mayor of said village, for a permit to repair and restore its defective tracks, road-beds, poles and over-head work along the line of its said electric railway within the limits

of said village; and that its said request has been refused and denied by the mayor of said village; and that its said request has also been refused and denied by the council of said village, unless this plaintiff shall replace the present equipment and construction of said electric railway within said village, with an equipment and construction not required by the terms of the grants of said Incline Plane Railway Company from the Hamilton County Commissioners, and from the village of St. Bernard, and of a kind and character substantially and materially different from that now in use, and substantially and materially different from that in use at any time, on any part of the line of said electric railway from its incipiency' to the present time, and from that of the original construction and equipment of said electric railway.

And plaintiff further avers, that the said village, through its council, mayor and marshall, defendants herein, have heretofore prevented plaintiff and still threaten to prevent, and, unless restrained by the order of this court, will prevent plaintiff from making the repairs to its electric railway within said village necessary to maintain same, and to the operation thereof, and that said interference with, and prevention of, plaintiff's making said repairs to its electric railway, if permitted, will cause this plaintiff great and irreparable injury by the destruction of the continuity of its railway by the prevention of the operation of its railway and by the further deterioration and destruction of its railway property within said village.

To this petition the village of St. Bernard, as well as each of the other defendants, filed a demurrer, upon the grounds,

1. That the court has no jurisdiction.
2. That separate causes of action against several defendants are improperly joined.
3. That the petition does not state facts sufficient to constitute a cause of action.

Counsel for defendants stated their reasons for this demurrer to be that plaintiff before being entitled to equitable relief, must first establish his right to damage at law, which goes to the first and third grounds of the demurrer, and their reasons for the second ground to be, that the several persons named as defendants in the caption of plaintiff's petition were not designated as officials. The demurrer must be overruled as to the second ground. It is sufficient to state that plaintiff in the body of his petition alleges the municipal character of the village of St. Bernard, as well as the official character of each of the defendants. Upon the first and third grounds of the demurrer I can only say that the injunction of a court of equity to protect franchises of this kind from alleged unlawful invasion or disturbance is clearly settled, (Milwaukee Electric R. & L. Co. v. Milwaukee, 95 Wis., 39.) The value of such a right or the cost of its lawful disturbance can not be reduced to a pecuniary measure. The ground of its exercise is usually the prevention of irreparable injury, or such as can not be adequately estimated in damages at law. I must also dismiss the further claim upon which the demurrer is based, that the court has no jurisdiction because it can not interfere with the discretion of council in refusing permits for repair. The very question to be determined, namely, whether council has such power, and if it has, whether the power has been reasonably exercised, are both for the determination of the court.

Upon the overruling of these demurrers, leave was given to the defendant to file an answer, which was done. In it defendant denies each and every other allegation in plaintiff's petition, and further answering says, that the Millcreek Valley Street Railroad Company on or about the 16th day of August, 1900, made application to the mayor and council of said village of St. Bernard for permission to make certain repairs of its rails, tracks, ties, etc.; that said village council granted to said company the application made by said company as aforesaid, by passing a resolution, number 208, a copy of which resolution is hereto attached and marked "Exhibit A".

Defendant further says that said, the Millcreek Valley Street Railroad Company, on or about said day or date, made application for permission to repair or renew its wires and poles used for the operation of its street railroad through the village of St. Bernard, and that pursuant to said application made by said company, said village council passed a resolution, No. 207, granting the permission asked for, as will more definitely appear from said resolution, a copy of which is hereto attached and marked Exhibit "B".

Defendant further says that it is ready and willing, and at all times has been ready and willing to grant permission to said company to make necessary repairs in the tracks and overhead equipments of said street railroad.

The resolutions are as follows:

Resolution 208.

Whereas, the Millcreek Valley Street Railroad Company, has made application to the council of the village of St. Bernard for permission to make certain repairs of its rails, tracks and ties:

Now, therefore, be it resolved that said, the Millcreek Valley Street Railroad Company be, and the same is hereby granted permission to repair such broken, spreading or disjointed rails, as may be found in its tracks within the limits of the village of St. Bernard, and

to replace all spreading or broken rails and to repair or renew all defective or broken ties and supports belonging to said tracks within the village of St. Bernard, upon the following terms and conditions:

FIRST: No new design or pattern of rail shall be substituted or used upon the tracks of said company, but the same style, pattern, kind, design and weight of rail shall be used in making said repairs as are now in place upon the tracks of said company in the Carthage Pike; and all old materials shall be immediately removed from the streets as soon as taken out .

SECONDLY: No reconstruction of said tracks shall be permitted, but simply the repairing of broken and defective rails, ties and supports for rails shall be made under this resolution.

THIRDLY: Before any rails or ties are removed, or other railroad ties substituted, said company shall make a written application therefor to the mayor of the village, specifying the location of the rail or rails to be taken out and replaced; and upon the mayor being satisfied that said repairs are to be made in good faith, and that the same should be made, he shall grant permission to said company to remove any such rails, ties or supports, and to replace the same with other rails and supports, in accordance with the limitations contained in this resolution, and of the kind herein described.

FOURTHLY: Not more than three hundred feet of the Carthage Pike upon which the said company's railroad tracks are constructed shall be disturbed or torn up at any one time, and before any additional part of said street shall be disturbed or torn up, for the purpose of repairing said street railroad, each 300 feet disturbed or torn up shall be replaced or restored in a good and substantial condition with good and substantial macadam upon the street to the satisfaction of the Committee on Public Improvements and the village engineer. It being hereby understood and agreed that if said company shall fail at any time to restore said street to a condition satisfactory to the committee on public improvements and the village engineer, the work of making further repairs under this resolution may be suspended or discontinued at the option of the committee on public improvements, until the repairs are made to the satisfaction of said committee and engineer.

FIFTHLY: Before commencing any of said repairs, said company shall furnish a good and sufficient bond in the sum of $1000, with an approved bonding company as surety thereon, to be approved by the council, and conditioned for the faithful performance on the part of said company for all conditions and things to be performed by it under this resolution.

SIXTHLY: It is hereby expressly understood and agreed that no new or additional rights or franchise, or grant or extension are hereby given to said company by this resolution, but that the only rights which the said company has in the Carthage Pike or any other street in the village are those which it possessed prior to the passage of this resolution.

SEVENTHLY: In making said repairs, the work shall be done in such manner as not to interfere with or impede public travel on the streets or side-walks.

Resolution 207.

Whereas, the Millcreek Valley Street Railroad Company has made application to the council of the village of St. Bernard for permission to repair or renew its wires and poles used for the operation of its street railroad through the village of St. Bernard.

Now, therefore, be it resolved by the council of the village of St. Bernard, that permission be, and the same is hereby granted to said Millcreek Valley Street Railroad Company, to repair or renew its wires, trollies and poles upn the following terms and conditions:

FIRST; All poles now owned by said company which are to be taken down shall be immediately taken off the streets and not permitted to lie or remain on the streets, after the same are taken down.

SECONDLY: All poles to be erected in place of poles taken down, shall be of metal and of the latest and most approved pattern, and shall be set in the side-walk within six inches of the curb line, but not in the cement walk, and shall be firmly imbedded in concrete and cement; and no wires shall be placed above or across any street within less than twenty feet of the surface thereof, except under over-head bridges or over-head construction. All of said poles to be erected in place of poles removed shall be placed in position within ninety days from the date when the work or erecting said poles shall begin; and before commencing the erection of said poles, notice thereof shall be given to the mayor, in writing, and the time for completing the erection of said poles shall begin to run from the date of said notice. All streets side-walks and portions thereof, shall be restored to as good condition as they were before the commencement of taking down and erecting said poles, and to the satisfaction of the committee on the public improvements of the village council and the village engineer.

THIRDLY: No guy poles or guy wires whatever, shall be erected or placed in any of the streets or any portion thereof.

FOURTHLY: The feed wires and trolley wires to be used shall be of the latest improved pattern ,and thoroughly insulated so as to minimize the danger from the electrical current. No double trolley wires shall be strung or used, but only single trollies as now used and in operation, and feed wires for single trollies only shall be strung on said poles.

FIFTHLY: In taking down the old poles and erecting new poles, and stringing wires, the same shall be done without interfering with the public travel, either upon the streets or side-walks, and where consents of property owners are necessary to be secured, said company shall, at its own cost and expense procure said consents, and settle with property owners for any damages or liability resulting from the repair and renewal of said poles and wires.

SIXTHLY: Before beginning any part of said work, said company shall give a good and sufficient bond in the sum of $2000, with an approved bonding company as surety thereon, and said bond to be approved by the village council, and conditioned for the faithful performance by said company of everything on its part to be performed under this resolution.

SEVENTHLY: Council reserves the right, and it is hereby agreed by said company, that it may employ a superintendent or inspector of the work, whose compensation shall be fixed by the council, and paid each week by said company until said repairs or renewals are completed.

EIGHTHLY: Council reserves the right, to require that said company, its successors or assigns (and this permit is granted upon this express condition) shall, whenever it is deemed practicable and advisable by the council of the village of St. Bernard, or of the proper board or officers who may hereafter be in control of the municipal affairs of said village, be required to place in suitable conduits or subways under the surface of the streets, all feed wires, trolley wires or other wires of whatever kind or nature necessary to be used by said company, its successors or assigns, in such a manner as not to unnecessarily interfere with the use of such streets for local improvements of any character, or with the sewers or water mains or branches thereof, or other conduits or subways.

NINTHLY: It is hereby expressly understood and agreed, and this permission is granted only upon this understanding and agreement that no new or additional rights or franchise or grant or extension are hereby intended to be given to said company, its successors or assigns by the granting of this permit: nor shall this permit be construed as granting any additional or new rights to said company other than those which it now possesses in and over thes treet known as the Carthage Pike in the village of St. Bernard, Hamilton County. Ohio.

The testimony introduced established the fact that the electric road owned by plaintiff has been in continuous operation for ten years, and that by reason of constant wear and tear, the road-bed, tracks and trolley wires have in numerous places become worn out, and a number of the wooden poles have rotted; that repairs have become an immediate necessity, but that the village authorities while permitting single urgent repairs to be made of rails, upon permit first obtained from the mayor, and the splicing of wires where necessary, without permit, will not grant a permission to plaintiff, to put in new wooden poles, or new trolley wires of an improved and safer pattern, or new rails instead of the old worn-out ones, unless the plaintiff will accept the conditions of the resolutions passed by council.

Upon these facts the legal question arises, has council the power to impose the new conditions embodied in the resolution upon the plaintiff? Counsel for defendant claims that the village is acting within its police power; that the passage of the resolution is a reasonable exercise thereof, and that therefore the court has no legal or equity power to interfere.

Before we enter upon an examination of the question thus raised, it may be well to determine what is meant by police power, and where the same is lodged. I can do no better than quote professor Tiedeman, who defines the power as follows:

"The police power of the government, as understood in the constitutional law of the United States, is simply the power of the government to establish provisions for the enforcement of the common as well as civil maxim, *sic utere tuo, ut alienum non laedas.* This police power of the state extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the state. According to the maxim, *sic utere tuo, ut allienum non laedas,* it being of universal application, it must of course be within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure others. And the law which goes beyond that principle, which undertakes to abolish rights, the exercise of which does not involve an infringement of the rights of others, or to limit the exercise of the rights, beyond what is necessary for the public welfare, and the general security, can not be included in the police power of the government. It is a governmental usurpation, and violates the principles

of abstract justice as they have been developed under our republican institutions."

It is an elementary proposition of law that this power is lodged in the sovereignty itself. namely, in the state, and when exercised by municipalities it can only be by reason of a direct grant of this power from the state through its general assemblies by statute. This is the rule laid down in our state by our supreme court, in Ravenna v. Pennsylvania Co., (45 O. S., 188), where it is held that municipal corporations in their public capacity, possess such powers and such only, as are expressly granted by statute, and such as may be implied as essential to carry into effect those which are expressly granted    Doubtful claims to power are resolved against the corporation.

Defendant claims that it possesses the power to refuse permission to plaintiff to repair its road unless the company accedes to the terms of the two resolutions, under section 2640, Revised Statutes, which reads as follows:

"The council shall have the care, supervision and control of all public highways, streets, avenues, alleys, side-walks, public grounds and bridges within the corporation, and shall cause the same to be kept open and in repair, and free from nuisance."

And counsel for defendant cite as authority for this claim the case of Railroad Co. v. Defiance, (55 O. S., 262), wherein the supreme court of our state lays down the following rules:

"The powers conferred on municipal corporations with respect to the opening, improving and repairing of their streets and public ways, are held in trust for public purposes and are continuing in their nature to be exercised from time to time as the public interest may require; and they can not be granted away, or relinquished, or their exercise suspended or abridged, except when, and to the extent legislative authority is expressly given to do so; such authority is not given by section 3283 of the Revised Statutes.

"Every grant in derogation of the right of the public in the free and unobstructed use of streets, or restriction of the control of the proper agencies of the municipal body over them, or of the legitimate exercise of their power; in the public interest, will be construed strictly against the grantee and liberally in favor of the public, and never extended beyond its express terms, when not indispensable to give effect to the grant."

Thus the claim the defendants. This, plaintiff denies and advances the following propositions as arising upon the evidence:

1. Defendant possesses no grant of police power, either direct or implied from the state, to enforce the resolutions passed.

2. If defendant possesses such police power, the demands made upon plaintiff in said resolutions are an unreasonable exercise of said power.

3. The grant made to the plaintiff's predecessor by the county commissioners and village authorities is a vested contract right, and the defendant, under the guise of the exercise of its police power, can not now change its terms without the assent of the plaintiff.

It will be seen that an examination of the plaintiff's first and second propositions involves also an examination of the defendant's claim, and if decided in plaintiff's favor will dispose of the case; if in defendant's favor, an examination of plaintiff's third contention will become necessary.

What are the duties of an electric railway in regard to its equipment, when the same becomes unsafe?    There can be but one answer, an answer in which the public at large, irrespective of municipal subdivisions, is vitally interested to-wit: immediate repairs.    This duty is so paramount that I need do no more than cite the language of the presiding judge of the Supreme Court of New York, Judge Van Brunt, in the three leading cases upon the subject, United States Illuminating Company v. Hugh J. Grant, as Mayor of New York City; The Brush Electric Ill. Co. v. same; the Mt. Morris Electric Light Company v. same, (55 Hun. 222):

"It is the duty of an electrical street railroad company to maintain its tracks, poles, wires and other street railroad equipment in a safe condition; if it fails so to do, it lays itself liable in damage for resultant injuries; and in case, local authorities refuse the company permission to make repairs, the law compels it to exhaust every legal remedy to prevent the interference of local authorities with such repairs as are necessary to place its construction and equipment in a safe condition."

If this is the duty of the railroad company, to be performed at its peril, what then, conversely, are its rights in the premises?    The rule laid down by the two Messrs Joyce, in the latest work on electric law, section 467, is undoubtedly the correct one:

"It is the duty of an electric street railway company to maintain its tracks in a safe condition, and upon the principle that what is the measure of its duty should also be the measure of its rights, it necessarily follows that it is entitled at all times to make necessary repairs."

This is the rule adopted by the Wisconsin Supreme Court in Milwaukee E. R. & L. Co.

v. The City of Milwaukee, 95 Wis. 39, and by other courts.

Section 2640 of our Revised Statutes places the care, supervision and control of all street within the municipality in its council. Under this grant of power, the village of St. Bernard can exercise all powers necessarily or fairly implied in or incident to the powers thus granted and when the statute is silent as to the mode of exercising it, the council has a discretion as to the manner in which the power shall be used, and this can not be judicially interfered with or questioned except where the power is exceeded or fraud imputed and shown, or there is a manifest invasion of private rights. Add to this the principle well established, and re-enunciated by Judge Williams of our Supreme Court, in Railroad Company v. Defiance, that in the interpretation of grants by municipalities, no implication will be indulged in derogation of the rights of the public in the absence of express or plain terms in the grant, and we have before us the relative rights of the village of St. Bernard and the electric railway company.

Applying the rules adduced to the case at bar, there can be no doubt that the village has the right, by virtue of the power over the streets thus granted it, to establish regulations for the conduct of plaintiff's business, which promote the public welfare, but which must not unreasonably interfere with the franchise, management or business of the company, or violate the obligations of any valid contract. As Judge Cooley says (Const. Lim, 710):

"The limit to the exercise of the police power in these cases (where charter rights are involved) must be this: The regulations must have reference to the comfort, safety or welfare of society; they must not be in conflict with any of the provisions of the charter; and they must not under pretense of regulation, take from the corporation any of the essential rights and privileges which the charter confers. In short, they must be police regulations in fact, and not amendments of the charter in curtailment of the corporate franchise."

These rules apply to the repairs sought to be made by plaintiff of its equipment, for the principle is a general one that where a business is authorized to be conducted by a corporation within the muncipality, the latter posses sses the same right to r gulate it that it has over a like business conducted by a private persons. A grant to a corporation of the right to own property and transact business affords no immunity from any police control to which the citizens would be subjected. And if the regulations adopted by the municipality are reasonable and not oppressive, and do not invade private rights by transcending the authority of the municipality, courts will not interfere with them.

Resolution No. 208 passed by the council recites, that the Millcreek Valley Street Railroad company had made application to the council of the village of St. Bernard for premission to make certain repairs of its rails, tracks and ties, and that premission is granted to repair such broken, spreading or disjoined rails, and repair or renew all defective or broken ties, and supports belonging to said tracks upon seven different conditions. The first prohibits the company from using new designs or patterns of rails in repairing its track, but orders the same style, pattern, kind, design and weight to be used as are used now. Is this a police regulation for the benefit of the community? No testimony was introduced, nor is there any word in this regulation showing that council has examined the different kinds of rail used by railroad companies, and found the old style of rail superior to the rail sought to be put down by the plaintiff. The testimony shows that the old rail is a side-bearing rail, whereas the new rail is a center-bearing rail used now by all electric railway companies, because it is more conducive to the comfort of passengers, doing away with the jolting, permitting vehicles to cross the tracks with ease, and being beneficial to the plaintiff, by preserving cars from early wear and tear. The testimony also showed that plaintiff could not comply with this regulation because the old rail is not manufactured any more. Is this regulation, then, an exercise of police power tending to the comfort, safety or welfare of the public? Surely not, and the court can only call it an unreasonable interference with the management of the company, whose right to repair in accordance with more improved methods is an incident of its grant.

The second condition prohibits the reconstruction of the tracks, and permits only the repairing of broken and defective rails, ties and supports for rails. The testimony shows that what defendant meant by this inhibition, was a refusal to permit the plaintiff to put down new equipment until the old was so absolutely defective as to be dangerous to travel. We have already seen that it is the duty of an electric railroad company to keep its track in good condition, and not wait until it becomes defective, as to become a menace to public safety, and that it is liable for injuries to others by reason thereof, even if the local authorities refuse permission to repair. Any absolute prohibition, therefore, to reconstruct its equipment, when by reason of ten year's constant use it has become dangerous to the public safety, whether this reconstruction means one rail or all, one tie or all, is not

an exercise of police power at all, but an arbitrary interference with the business of the plaintiff, thereby endangering the public welfare.

The third condition prescribes that, before any rails or ties are removed, or other rails and ties substituted, the company shall make a written application to the mayor, specifying the location of the rail or rails, and tie or ties, and supports to be taken out and replaced, and upon the mayor being satisfied that said repairs are asked to be made in good faith, and that the same should be made, he shall grant permission to remove any such rails, ties and supports in accordance with the limitations contained in this resolution, and of the kind herein described.

There is no doubt that council has the right to demand application to be made by the company, and an investigation had of the necessity of the repairs, before it need permit its street to be torn up, but that is as far as its power goes. When it couples with the condition the further demand that no new design of rail shall be substituted, but the old style must be used again, it exceeds legitimate police power, and as to this excess the condition is void. The testimony shows that the plaintiff has complied with the condition, and made application for a permit which, however, has been refused, unless plaintiff accepts all the conditions contained in both resolutions.

The fourth condition prohibits the tearing up of more than 300 feet of the Carthage Pike at any one time, until said portion has been restored to a good substantial condition, with good and substantial macadam upon the street to the satisfaction of the committee on public improvements, and the village engineer, and unless the latter are satisfied with the restoration, that the work of making further repairs may be suspended by said committee.

This is a valid and proper exercise of the police power of the village. Some testimony was introduced that plaintiff feared an arbitrary use of such power by the committee, owing to the unfriendly relation between plaintiff and defendant; but even were this so, this would only be a matter for future determination by the courts, and only goes to the use or abuse of the power, not to its legality.

The fifth condition demands a bond of one thousand dollars of the plaintiff conditioned for the faithful performance on the part of the company of all conditions and things by it to be performed under this resolution. This can only mean the performance of the legal conditions under the resolution, and is a valid exercise of the police power of the municipality.

The sixth condition expressly provides that no new franchises are granted to plaintiff, and does not call for any judicial interpretation.

The seventh condition provides that the work of repairing shall be done in such a manner as not to interfere with or impede public travel on the streets or side-walks, and is a valid and proper exercise of the police power, entrusted to municipalities.

Resolution number 209 recites that the Millcreek Valley Street Railroad Company has made application to the council of the village of St. Bernard for permission to repair or renew its wires and poles used for the operation of its street railroad through the village, and grants said permission upon acceptance by the plaintiff of nine conditions.

The first orders the company to take all poles removed immediately from the street. This is a proper exercise of its police power.

The second condition reads as follows:

"All poles to be erected in place of poles taken down, shall be of metal and of the latest and most approved pattern, and shall be set in the side-walk within six inches of the curb line, but not in the cement walk, and shall be firmly imbedded in concrete and cement; and no wires shall be placed above or across any street within less than 20 feet of the surface thereof, except under overhead bridge or other overhead construction. All of said poles, to be erected in place of poles removed shall be placed in position within 90 days from the date when the work of erecting said poles shall begin; and before commencing the erection of said poles, notice thereof shall be given to the mayor, in writing, and the time for completing the erection of said poles shall begin to run from the date of said notice. All streets, side-walks and portions thereof shall be restored to as good condition as they were before the commencement of taking down and erecting said poles, and to the satisfaction of the committee on public improvements of the village council and the village engineer."

The manner in which the plaintiff shall perform its work, prescribed by council in this paragraph, is undoubtedly a proper exercise of the police power delegated to it by the state. The council has full control over its streets, and may prescribe a reasonable manner and time to be used by a private corporation in tearing up the streets for its own purposes. But a more serious question arises when council orders the plaintiff to replace the wooden poles taken down with metal poles of the latest and most approved pattern. That a council would have the right, when orginally granting a franchise to impose any conditions which the general assembly could exact, admits of no discussion; but in the case at bar, the testi-

.mony shows that the grant of plaintiff's pre-decessor, from whom it derives title, both from the County Commissioners and the Village of St. Bernard, left it optional with the company to use wooden poles, and that the same have been used over the entire line ever since the beginning of its operation, more than ten years. The testimony does not show that wooden poles are more dangerous than metal poles to the safety of the public, but the preponderance of the testimony was to the contrary, when used under the single trolley system. It showed further, that in localities in which metal poles had been used for single trolley system, wooden poles were substituted. I cite this testimony because I doubt not that council would have the right, notwithstanding the orginal grant, to order the removal of wooden poles, if the same were dangerous to human safety, or even interfered with the conv nience of the public. This would be a proper exercise of the police power, delegated to a municipality, a right which council could not barter away, even if it had done so originally, for the rights of the public are paramount to those of a private corporation, and every grant is made subject to the police power of the state, and contracts dealing with the rights of the public will always be construed strictly against the private corporation.

. What, then, is the rule of law to be applied in this instance? Mr. Henry J. Booth, well known as one of the ablest lawyers of our state, lays down the following rule in his work on "Street Railways", section 231:

"If the charter is silent as to the kind of track and equipment, municipal authorities have no power to compel a company to adopt and use such rails or appliances as the council may deem proper, or to prevent it from making reasonable changes in those respects. The adoption and use for a time of a switch operated by hand would not preclude the company from superseding it with an automatic switch or some other improved appliance .The use of a certain kind of rail would not prevent the substitution of some other, especially if the change would not result in material inconvenience to the travelling public. The use of poles made of one material would not estop the company from adopting a different variety, if the change would not incommode others in their use of the streets. And it is doubtful whether even a change of gauge could be prevented or compelled by municipal regulation. Every year brings into use numerous improved devices, which may be adopted without the consent of the local authorities; and when an attempt is made by municipal by-laws to interfere in such matters of detail with the management and business of the railway,

where no public or private right is invaded, the company will be entitled to the protection of the courts. This principle, however, can not be carried to such an extent as to abridge the right of local authorities to exercise a reasonable control over those who have obtained franchises in the streets, or to prevent a strict enforcement of all obligations which have been assumed by private agreement. A city may, when granting the right of way, attach any condition not in conflict with its delegated powers; but it can not thereafter impose new obligations or duties which are not necessary for the public safety and convenience."

A similar question arose under similar circumstances, council requiring a change of gauge years after the original grant had been made, in the Desmoines Street Railway Company v. The Desmoines Broad Gauge Street Railroad Company, 74 Iowa, Reports, 585, the Supreme Court holding that the city did not have power to require the railway company to lay down an additional track for which they had petitioned on a different gauge from that theretofore in use.

I believe the rule laid down by Mr. Booth to be correct. Vested contractual rights can not be disturbed by later municipal legislation; but this does not mean that the municipal authorities are powerless to act for the public good. All contracts entered into by the state, or by its delegated authorities, are subject to a proper exercise of its police power, and, the court in the last instance is the tribunal to determine, in a case properly presented, whether the action of council is such a reasonable exercise of its delegated police power, or whether it is an improper regulation under the guise of the exercise of the police power; for while the court will not interfere with the discretion of municipal authorities, it must do so when the acts complained of are manifestly unreasonable or unwarrantly invade private rights. The court would uphold the action of council if the testimony showed that the change of poles would add to the convenience, comfort, safety or welfare of the public; but as the testimony does not show this, the court must find that the exaction of this condition is not a legitimate exercise of the police power but an invasion of private rights.

The third condition prohibits the erection of guy poles or guy wires whatsoever in any of the streets. The rule of law is that a grant by the public authorities to a railway company to use electricity for the propulsion of its cars, includes the right to erect poles on the side-walk and suspend thereon the necessary wires, unless some other mode of construction is prescribed. The testimony show-

ed that guy poles are short poles used at curves, and guy wires are wires attached to these poles and the trolley wires, in order to hold the latter in position. The testimony further showed that under present improved conditions, they were not necessary any more for the proper conduct of an electric railway. If still necessary to the proper management of an electric railway, and had thus been used since the beginning of the road, council would not have the power to order them removed; but since the testimony shows that they are not necessary, and simply encumber the sidewalks of the village, their removal is a proper exercise of its police power.

The fourth condition demands that the new feed and trolley wires shall be of the latest improved pattern, and thoroughly insulated so as to minimize the danger from the electrical current, and that no change shall be permitted from the grant for a single trolley system to a double trolley system. As said before, council has the right to demand the greatest safety for the public, and where it grants permission to change all the wires, instead of repairing a few, it is a proper exercise of its police power to exact wires as thoroughly insulated as possible, in order to minimize the danger from the electrical current.

Regarding the other provision, prohibiting a change from the original grant of a single trolley system to an entirely new system, the testimony showed that no such permission was sought by plaintiff, and its insertion is surplusage.

Condition five, demanding that the work of the plaintiff shall be done without interfering with public travel, either upon the streets or side-walks and that plaintiff shall be liable for costs or damage accruing during the progress of the work, is a proper exercise of the police power of the village, always remembering that these provisions must be construed reasonably, and not arbitrarily.

The sixth condition, requiring a bond to be given in the sum of two thousand dollars by the plaintiff for faithful performance of every legal obligation un er this resolution, is a valid exercise of the police power.

In the seventh condition, council reserves the right to employ a superintendant or inspector of the work, whose compensation shall be fixed by council and paid each week by the plaintiff. That council has the right to demand that the streets and side-walks shall be placed in good condition again while the work of repairing is going on, and delegate the power to accept or reject said streets and side-walks to a proper official can not be doubted; but it certainly has not the power to impose the payment of his salary upon the plaintiff. Our Supreme Court has determined this question in Ravenna v. The Pennslyvania Co.

The eighth condition reads as follows:

"Council reserves the right to require that said company, its successors or assigns (and this permit is granted upon this express condition) shall whenever it is deemed practicable and advisable by the council of the village of St. Bernard, or of the proper board of officers who may hereafter be in control of the municipal affairs of said village, be required to place in suitable conduits or subways under the surface of the street, all feed wires, trolley wires or other wires of whatsoever kind or nature, necessary to be used by said company, its successors or assigns, in such a manner as not to unnecessarily interfere with the use of such street for local improvements of any character, or with the sewers or water mains or branches thereof, or other conduits or subways."

I have made a diligent search of the statutes enacted by our General Assembly, but I have failed to find one in which the state has delegated its power in this respect to any municipality. That the state has the power to make such requirements under the exercise of its police power, I believe; but until the state acts through its legislature and delegates such power directly to municipalities, councils have no right to exact such conditions, after a grant has once been made to a corporation. Originally, undoubtedly, when the village granted the franchise such condition might have been imposed as part of the grant, and not as an exercise of police power; but to do so now requires express legislation by the state. The New York decisions in the Sub Way cases, cited to me, are based upon an act of the New York Assembly, granting this power directly to the city of New York, and the action of the city authorities of New York was held valid as a proper exercise of the state police power, thus delegated. This condition is therefore, void.

The ninth condition is simply expressive of the fact that the permit to repair is not the grant of a new franchise.

I have thus made a careful examination of the questions presented to me in the case at bar, and believe that I have applied the law as it exists at the present time, to every phase thereof, including the claim of plaintiff that that its charter is a vested contract right. which is true. but does not for that reason relieve it from the operation of the state's legitimately exercised police power.

Plaintiff is entitled to his restraining order, upon complying with those conditions of the resolutions found valid by the court; and a decree may be drawn accordingly.